**UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CELIA CASTELAZ; BRITTANIE NALLEY; NORTHA JOHNSON; and LORI CARTER, individually and on behalf of all others similarly situated, | Case No.: l:22-cv-05713-LCJ |
| Plaintiffs, | **CORRECTED FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| THE ESTÉE LAUDER COMPANIES INC.; BOBBI BROWN PROFESSIONAL COSMETICS, INC.; ESTÉE LAUDER INC.; SMASHBOX BEAUTY COSMETICS, INC.; TOO FACED COSMETICS, LLC; and PERFECT CORP. | |
| Defendants. | |

Celia Castelaz, Brittanie Nalley, Northa Johnson, and Lori Carter (together "Plaintiffs"), individually and on behalf of all others similarly situated (collectively, the "Class," as more fully defined below), bring this Class Action Complaint against Defendants: The Estée Lauder Companies Inc. ("Estee"), Bobbi Brown Professional Cosmetics, Inc. ("Bobbi Brown"), Estée Lauder Inc. ("Estée Lauder"), Smashbox Beauty Cosmetics, Inc. ("Smashbox"), and Too Faced Cosmetics, LLC ("Too Faced" and together with Estee, Bobbi Brown, Estee Lauder, Smashbox, and Too Faced, the "Cosmetics Defendants"), and Perfect Corp. ("Perfect") (each individually a "Defendant" and collectively, "Defendants"). Based upon Plaintiffs' personal knowledge, investigation by retained counsel, and personal belief, they allege as follows:

## NATURE OF THE CASE

1.       When consumers shop for products, they expect that companies will follow the law in promoting and advertising those products.

2.       Consumers expect that, if they are sharing their data with companies in connection with a potential transaction, the companies will be transparent about what data is being collected, how it is being used, and by whom.[1] This is particularly the case when companies collect what has come to be known as "biometric data."

3.       Facial scanning technology, which is used for anything from applying filters to photographs to verifying a user's identity, uses biometric data. Fingerprint authentication, where a user's fingerprint acts as a password or key, is another type of technology that uses biometric data.

---

[1] Lisa Joy Rosner, How Biometric Data Will Shift The Privacy Conversation, *Forbes* (July 2, 2019), *available at* https://www.forbes.com/sites/forbescommunicationscouncil/2019/07/02/how-biometric-data-will-shift-the-privacy-conversation/?sh=38b3ce093f4c.

4.      Consumers have substantial privacy concerns regarding the use of facial scanning. According to a recent survey, more than 80% of consumers are uncomfortable with apps storing images of their faces.[2] And for good reason: for example, in the not-too-distant past, a relatively unknown company, Clearview AI, was caught scraping user photos from social media companies' databases and using facial-recognition technology on those photos to compile a database for secret and illicit surveillance purposes.[3]

5.      In response to the ever-increasing prevalence and proliferation of biometric information collection (whether lawful or not), the Illinois General Assembly passed the Biometric Information Privacy Act of 2008, 740 Ill. Comp. Stat. §§14, *et seq*. ("BIPA").

6.      BIPA recognizes that because biometric information is "unlike other unique identifiers that are used to access finances or other sensitive information," in that it cannot be changed and is "biologically unique to the individual," special protections needed to be placed upon its use, collection, retention, and destruction.

7.      In the language of the BIPA statute itself, the Illinois General Assembly directly addressed the public's stake in this important sphere of data privacy, noting that "[a]n overwhelming majority of members of the public *are weary of the use of biometrics when such information is tied to finances and other personal information.*" 740 Ill. Comp. Stat. §14/5 (emphasis added).

---

[2] Danielle Commisso, Concerns Grow Over Consumer Privacy and Facial Recognition Tech, Civic Science (Apr. 20, 2021), *available at* https://civicscience.com/concerns-grow-over-consumer-privacy-and-facial-recognition-tech/#:~:text=Like%20most%20new%20technologies%2C%20younger%20generations%20are%20more,facial%20recognition%20use%20on%20social%20media%20and%20apps.

[3] Will Knight, Clearview AI Has New Tools to Identify You in Photos, *Wired* (Oct. 4, 2021), *available at* Clearview AI Has New Tools to Identify You in Photos | WIRED.

8.      Recognizing that typical consumers are not equipped to defend themselves from large corporations bent on acquiring and monetizing their most private, unchangeable information, the Illinois Legislature, by enacting BIPA, gave consumers a powerful, protective tool.

9.      Despite consumer concerns regarding facial-scanning technology, and BIPA's clear mandate, Defendants have refused (until only very recently and after the filing of the initial Complaint in this matter), to inform website users that they are using technology on Cosmetics Defendants' beauty brand websites, including, as relevant here, toofaced.com, smashbox.com, esteelauder.com, and bobbibrowncosmetics.com (together, the "Brand Websites") to collect users' biometric identifiers and biometric information including facial scans (collectively "biometric data"), and neither inform website users that their biometric identifiers are being collected, nor ask for their consent.

10.      Cosmetics Defendants sell the image of glamour and beauty to consumers, inviting them to virtually "try on" makeup using various "Virtual Try-On" tools found on each of the Brand Websites, including but not limited to the following features that have been available on the Brand Websites at various times: a general makeup (*e.g.*, eyes, lips, foundation, blush) Virtual Try On feature, iMatch Virtual Shade Expert (foundation), iMatch Virtual Skin Analysis, and the "Complete Look" Virtual Try-On (each a "VTO" and collectively the "VTOs").

11.      Using the VTOs, visitors to the Brand Websites—including Plaintiffs and Class members—can view themselves with various makeup products on their face. All a user needs to do is enable their computer camera or phone camera, after which the technology embedded and running on the Brand Websites creates a live video feed of the user's face by capturing biometric data, with the selected makeup products applied on top of the live feed. Alternatively, some of the VTOs allow a user to upload a photo to be used by the VTOs on the Brand Websites. The VTO

then collects biometric data from the photo to place the selected makeup products on the user's face.

12.     The user is also given the option to capture a static image with the selected makeup product(s) on the user's face. Once the image is captured, the image can then be shared via Facebook, e-mail, Twitter, or Pinterest. The photograph can also be downloaded to the user's device.

13.     The VTOs operate on the Brand Websites using Perfect's YouCam technology.

14.     As Perfect explains on its website:

  a.  "The ultra-realistic AI and AR-powered virtual makeup try-on experience is like looking into a virtual mirror."[4]



  b.  Perfect's VTO technology "detects more than 70 facial characteristics, including face, eye, brow, and lip shapes, as well as color and shade detection for eyes, eyebrows, lips, hair and skin tone, to better understand a user's attributes and generate a personalized beauty profile."[5]

---

[4] *See* https://www.perfectcorp.com/business/products/virtual-makeup, last visited June 19, 2023. Below screenshot from https://www.perfectcorp.com/business/products/virtual-makeup, June 19, 2023.
[5] *See* https://www.businesswire.com/news/home/20210924005177/en/Perfect-Corp.-Debuts-New-AI-Face-Analyzer-Technology-for-a-Tailored-Consumer-Shopping-Experience, last visited June 19, 2023.

c.     Perfect's VTO technology provides "highly accurate facial mapping for a true-to-life makeover experience."[6]



d.     Perfect's "[i]n-depth facial mapping develops an accurate 3D face AR makeup look from a photo or print image that users can try on in seconds."[7]

15.     The VTOs embedded on the Brand Websites function by capturing and collecting a user's biometric data and applying virtual makeup over the appropriate part of the face.

16.     For instance, the iMatch Virtual Shade Expert tool contains a function named "getLandmarks" that outputs more than one hundred x and y coordinates for the facial landmarks of the user.

---

[6] *See* https://www.perfectcorp.com/business/technologies/face-ai, last visited June 19, 2023. Below screenshot from https://www.perfectcorp.com/business/technologies/face-ai, June 19, 2023.
[7] *Id.*

```
> YMK.getLandmarks()
▶ {width: 390, height: 844}
◄ (106) [{…}, {…}, {…}, {…}, {…}, {…}, {…}, {…}, {…}, {…}, {…}, {…
  ▼ {…}, {…}, {…}, {…}, {…}, {…}, {…}, {…}, {…}, {…}, {…}, {…},
    {…}, {…}, {…}, {…}, {…}, {…}, {…}, {…}, {…}, {…}, {…}, {…},
    {…}, {…}, {…}, …] ⓘ
    ▼ [0 … 99]
      ▶ 0: {x: 44.86430570483208, y: 516.5211486816406}
      ▶ 1: {x: 52.24609449505806, y: 531.260246515274}
      ▶ 2: {x: 59.62788328528404, y: 545.9993443489075}
      ▶ 3: {x: 67.00967788696289, y: 560.7384421825409}
      ▶ 4: {x: 74.74813297390938, y: 573.9760975837708}
      ▶ 5: {x: 82.48659387230873, y: 587.2137529850006}
      ▶ 6: {x: 89.43848043680191, y: 599.0319149494171}
      ▶ 7: {x: 96.90518036484718, y: 610.4979829788208}
      ▶ 8: {x: 104.84661787748337, y: 621.5635623931885}
      ▶ 9: {x: 113.7188583612442, y: 632.0536878108978}
      ▶ 10: {x: 124.01391685009003, y: 641.7384593486786}
      ▶ 11: {x: 135.38371056318283, y: 650.0131447315216}
      ▶ 12: {x: 147.63495057821274, y: 656.7174680233002}
      ▶ 13: {x: 160.56803673505783, y: 662.5532023906708}
      ▶ 14: {x: 173.9523822069168, y: 666.3955488204956}
```

17. When these coordinates are plotted on a basic x and y axis scatterplot, the distinct biometric landmarks of the user are clearly visible.



18. Each call of the "getLandmarks" function captures the precise coordinates of the user's facial landmarks in real time, reflecting changes in the user's expression, position, and orientation instantaneously. By repeatedly calling this function or similar functions multiple times

per second, the tool can use the user's biometric data to overlay cosmetics in the appropriate position on live video of the user's face, creating a real-time interactive experience based on the user's biometric data.

19.     Cosmetics Defendants embedded the VTOs onto their Brand Websites and encouraged website visitors to use the VTOs.

20.     At all relevant times and prior to the filing of the initial Complaint in this matter, Cosmetic Defendants had not created a data retention schedule, policy, or guidelines, did not publish a data retention schedule, policy, or guidelines, and therefore Defendants did not follow, adhere to, or otherwise comply with or abide by any such policy establishing a retention schedule and guidelines for destroying biometric data obtained from users of the Brand Websites' VTOs. At all relevant times, the Privacy Policies on the Brand Websites failed to contain any reference to biometric data, the VTO, or the "virtual try-on experience."

21.     Very recently and well after the filing of the initial Complaint, the Brand Websites updated each of the Privacy Policies to admit they may collect biometric information:

> "This section applies solely to Illinois residents and supplements our Privacy Policy above. As indicated in our Privacy Policy, **we may collect biometric information such as facial geometry if you use certain of our virtual try-on applications.** For Illinois residents who provide us with biometric information (such as during use of our virtual try-on apps), in accordance with Illinois state law, we will retain biometric information only until the occurrence of the first of the following: The initial purpose for collecting or obtaining such biometric information has been satisfied, or [t]hree years following your last interaction with us." (emphasis added).

22.     At all relevant times and unbeknownst to the Brand Websites' users—including Plaintiffs and Class members—Defendants captured and collected users' detailed and sensitive biometric data, including complete facial scans and facial maps, through the VTOs on the Brand Websites, and Defendants did this without first obtaining users' consent, or informing them their biometric data was being collected, as required.

23.     VTO users have no ability to access, control, remove, or request Defendants to remove and destroy their biometric data captured during the VTO sessions.

24.     At all relevant times, Defendants also failed to disclose to visitors of the Brand Websites who used the VTOs—including Plaintiffs and Class members—that their biometric data was being captured, collected, used, possessed and/or otherwise obtained by Defendants.

25.     At all relevant times and until very recently, Defendants also failed to inform VTO users of the specific purpose for the capture and collection of their biometric data; failed to provide and/or publish a schedule setting out the length of time during which their biometric data will be collected, used, possessed and/or otherwise obtained or when it will be destroyed; and failed to comply with BIPA's retention and destruction guidelines.

26.     Defendants violated BIPA each time a Brand Website visitor based in Illinois used Defendants' VTOs found on the Brand Websites during the relevant period, because Defendants captured, collected, used, possessed, and/or otherwise obtained, VTO users' biometric data without disclosure to or consent of any of the consumers who try on cosmetics on the Brand Websites, necessarily using Defendants' VTO to do so.

27.     Defendants also violated BIPA because Defendants did not comply with BIPA's permanent destruction guidelines that biometric data in Defendants' possession must be permanently destroyed either when the initial purpose for collecting or obtaining such identifiers or information has been satisfied, or within 3 years of the consumer's last interaction with Defendants' VTOs, whichever comes first.

28.     As a result of Defendants' BIPA violations, Plaintiffs, individually and on behalf of Class members, ask the Court to impose upon Defendants the BIPA-mandated statutory penalties relating to the capture, collection, use, and possession of Plaintiffs' and Class Members

biometric data, as well as injunctive relief requiring Defendants' destruction of any already-captured biometric data, and their permanent adoption of disclosures which comply with BIPA and adequately inform consumers about Defendants' biometric policies.

## JURISDICTION AND VENUE

29.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332, because: (a) this is a proposed class action in which there are at least 100 Class members; (b) the parties are minimally diverse, as Plaintiffs and Defendants are domiciled in different states; and (c) the combined claims of Class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs.

30.     This Court has personal jurisdiction over Defendants Estée, Bobbi Brown, Estée Lauder, Smashbox, and Too Faced because Cosmetics Defendants regularly conduct business throughout Illinois, including selling cosmetics in Illinois, recruiting and employing people in Illinois, and offering the VTOs on the Brand Websites to consumers in Illinois.

31.     This Court has personal jurisdiction over Defendant Perfect because Perfect regularly ran and provided VTO sessions to Brand Websites users in Illinois, including downloading the code necessary to run the VTO sessions onto Illinois consumers' devices while the consumers were in Illinois. Thus, Perfect reached into Illinois in order to provide code necessary to run the VTO sessions.  Accordingly, Perfect's contacts within Illinois are systemic and continuous by virtue of its provision of the code enabling the VTO sessions.  Consumers were harmed because of Perfect's actions, and thus bring suit against Perfect in this jurisdiction specifically related to the actions complained of in the forum state.

32.     Venue is also appropriate in this District under 28 U.S.C. § 1391(b)(2) because, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

### *Plaintiff Celia Castelaz*

33.     Celia Castelaz is a citizen and a resident of DuPage County, in the State of Illinois. While at her residence in DuPage, Ms. Castelaz used the VTOs on the websites of Estée Lauder (esteelauder.com), Bobbi Brown (bobbibrowncosmetics.com), and Smashbox (smashbox.com), multiple times in 2021 and early 2022 to try on various types of makeup, spending approximately thirty minutes to one hour on each Brand Website each time she used the VTOs.  At all relevant times, Defendants failed to provide any disclosures to Ms. Castelaz related to the capture, collection, use, and/or possession of biometric data.

34.     Ms. Castelaz does not recall seeing or reviewing any terms and conditions or privacy policies when visiting esteelauder.com, bobbibrowncosmetics.com, and smashbox.com, or when using the VTOs on those websites, nor does she recall Cosmetic Defendants or Perfect making such policies readily accessible on esteelauder.com, bobbibrowncosmetics.com, smashbox.com, or otherwise so she could review them prior to using the VTOs.  Ms. Castelaz did not see any caution that her biometric data would be captured, collected, used, possessed and/or otherwise obtained if she used Defendants' VTOs. Ms. Castelaz was also not informed by Defendants (for instance, by a pop-up notification upon activation of the VTO) that using the VTOs would allow Defendants to capture and collect her biometric data.

35.     Ms. Castelaz did not understand that Defendants would capture, collect, use, possess and/or otherwise obtain her biometric data, and she would not have used the VTOs on esteelauder.com, bobbibrowncosmetics.com, and smashbox.com had she been aware of this fact.

36.     Defendants never obtained, or attempted to obtain, Ms. Castelaz's informed, written consent to capture, collect, use, possess, and/or otherwise obtain her biometric data, nor

10

did Defendants inform Ms. Castelaz about the length of time her biometric data would be stored, or when or whether it would be destroyed.

37.     Ms. Castelaz never provided a written release to Defendants authorizing Defendants to capture, collect, use, possess and/or otherwise obtain her biometric data, including her facial scans or facial geometry, and she was never informed, in writing or otherwise, about the purpose for collecting her biometric data.

***Plaintiff Brittanie Nalley***

38.     Brittanie Nalley is a citizen and a resident of Saline County, in the State of Illinois. While at her residence in Saline County, Illinois, Ms. Nalley used Too Faced's VTOs on toofaced.com approximately four times to try on various types of makeup, with her most recent use of the VTO occurring around February 2022. Ms. Nalley spent approximately thirty minutes on toofaced.com each time that she used the VTO. At all relevant times, Too Faced and Perfect failed to provide any disclosures to Ms. Nalley related to their capture, collection, use, and/or possession, of biometric data.

39.     Ms. Nalley does not recall seeing or reviewing any terms and conditions or privacy policies when visiting toofaced.com or using the VTO, nor does she recall Too Faced or Perfect making such policies readily accessible on toofaced.com or otherwise so that she could review them prior to using the VTO.  Ms. Nalley did not see any caution that her biometric data would be captured, collected, used, possessed, and/or otherwise obtained if she used the VTO. Ms. Nalley was also not informed by Too Faced or Perfect (for instance, by a pop-up notification upon activation of the VTO) that using the VTO on toofaced.com would allow Too Faced and Perfect to capture and collect her biometric data.

40.     Ms. Nalley did not understand that Too Faced and Perfect would capture, collect, use, possess, and/or otherwise obtain her biometric data, and she would not have used the VTO on toofaced.com had she been aware of this fact.

41.     Too Faced and Perfect never obtained, or attempted to obtain, Ms. Nalley's informed, written consent to capture, collect, use, possess and/or otherwise obtain her biometric data, nor did Too Faced or Perfect inform Ms. Nalley about the length of time her biometric data would be stored, or when or whether it would be destroyed.

42.     Ms. Nalley never provided a written release to Too Faced or Perfect authorizing them to capture, collect, use, process, and/or store her biometric data including her facial scans or facial geometry, and she was never informed, in writing or otherwise, about the purpose for collecting her biometric data.

***Plaintiff Lori Carter***

43.     Lori Carter is a citizen and a resident of St. Clair County, in the State of Illinois. While at her residence in St. Clair County, Illinois, Ms. Carter used Bobbi Brown's VTO on bobbibrowncosmetics.com approximately four times to try on various types of makeup, with her most recent time using the VTO occurring in November 2021. Ms. Carter spent between fifteen and forty-five minutes on bobbibrowncosmetics.com each time that she used the VTO. At all relevant times, Bobbi Brown and Perfect failed to provide any disclosures to Ms. Carter related to their capture, collection, use, and/or possession of biometric data.

44.     Ms. Carter does not recall seeing or reviewing any terms and conditions or privacy policies when visiting bobbibrowncosmetics.com or using the VTO, nor does she recall Bobbi Brown or Perfect making such policies readily accessible on bobbibrowncosmetics.com or otherwise so that she could review them prior to using the VTO. Ms. Carter did not see any caution

that her biometric data would be captured, collected, used, possessed and/or otherwise obtain if she used the VTO. Ms. Carter was also not informed by Bobbi Brown or Perfect (for instance, by a pop-up notification upon activation of the VTO) that using the VTO on bobbibrowncosmetics.com would allow Bobbi Brown and Perfect to capture and collect her biometric data.

45. Ms. Carter did not understand that Bobbi Brown and Perfect would capture, collect, use, possess and/or otherwise obtain her biometric data, and she would not have used the VTO on bobbibrowncosmetics.com had she been aware of this fact.

46. Bobbi Brown and Perfect never obtained, or attempted to obtain, Ms. Carter's informed, written consent to capture, collect, use, possess, and/or otherwise obtain her biometric data, nor did Bobbi Brown or Perfect inform Ms. Carter about the length of time her biometric data would be stored, when or whether it would be destroyed.

47. Ms. Carter never provided a written release to Bobbi Brown or Perfect authorizing them to capture, collect, use, possess and/or otherwise obtain her biometric identifiers or biometric information, including facial scans or facial geometry, and she was never informed, in writing or otherwise, about the purpose for collecting her biometric data.

***Plaintiff Northa Johnson***

48. Northa Johnson is a citizen and a resident of Cook County, in the State of Illinois. While at her residence in Cook County, Illinois, Ms. Johnson used Smashbox's VTO on smashbox.com approximately four times to try on various types of makeup, with her most recent time using the VTO occurring in late 2021. Ms. Johnson spent between twenty and thirty minutes on smashbox.com each time that she used the VTO. At all relevant times, Smashbox and Perfect

failed to provide any disclosures to Ms. Johnson related to their capture, collection, use and/or possession of biometric data.

49.    Ms. Johnson does not recall seeing or reviewing any terms and conditions or privacy policies when visiting smashbox.com or using the VTO, nor does she recall Smashbox or Perfect making such policies readily accessible on smashbox.com or otherwise so that she could review them prior to using the VTO. Ms. Johnson did not see any caution that her biometric data would be captured, collected, used, possessed and/or otherwise obtained if she used the VTO. Ms. Johnson was also not informed by Smashbox or Perfect (for instance, by a pop-up notification upon activation of the VTO) that using the VTO on smashbox.com would allow Smashbox and Perfect to capture and collect her biometric data.

50.    Ms. Johnson did not understand that Smashbox and Perfect would capture, collect, use, possess and/or otherwise obtain her biometric data, and she would not have used the VTO on smashbox.com had she been aware of this fact.

51.    Smashbox and Perfect never obtained, or attempted to obtain, Ms. Johnson's informed, written consent to capture, collect, use, possess and/or otherwise obtain her biometric data nor did Smashbox or Perfect inform Ms. Johnson about the length of time her biometric data would be stored, or when or whether it would be destroyed.

52.    Ms. Johnson never provided a written release to Smashbox or Perfect authorizing them to capture, collect, use, possess and/or otherwise obtain her biometric data, including facial scans or facial geometry, and she was never informed, in writing or otherwise, about the purpose for collecting her biometric data.

*Defendants*

53.  Defendant and parent company of the Cosmetics Defendants, The Estée Lauder Companies Inc., is incorporated in Delaware, with its principal place of business at 767 Fifth Avenue, New York, NY 10153.

54.  The Estée Lauder Companies Inc. is one of the world's leading manufacturers and marketers of quality skin care, makeup, fragrance, and hair care products. The company's products are sold in approximately 150 countries and territories, and marketed through its subsidiary brands, including, as relevant here: Bobbi Brown, Estée Lauder, Smashbox, and Too Faced.

55.  In 2021, The Estée Lauder Companies Inc. had $16.22 billion in consolidated sales and $2.62 billion in operating income.

56.  On information and belief, The Estée Lauder Companies Inc. made, oversaw, and/or approved the decision to implement the VTOs on each of its subsidiary's websites, including on esteelauder.com, toofaced.com, smashbox.com, and bobbibrowncosmetics.com.

57.  Defendant Bobbi Brown, a wholly-owned subsidiary of The Estée Lauder Companies Inc., is incorporated in Delaware, with its principal place of business at 575 Broadway #4, New York, NY 10012.

58.  Defendant Estée Lauder, a wholly-owned subsidiary of The Estée Lauder Companies Inc., is incorporated in Delaware, with its principal place of business at 767 Fifth Avenue, New York, NY 10153.

59.  Defendant Smashbox, a wholly-owned subsidiary of The Estée Lauder Companies Inc., is incorporated in California, with its principal place of business at 5838 Warner Drive, Culver City, CA 90232.

60.     Defendant Too Faced, a wholly-owned subsidiary of The Estée Lauder Companies Inc., is incorporated in Delaware, with its principal place of business at 18231 McDurmott West, Irvine, CA 92614.

61.     Cosmetics Defendants sell their makeup products in brick-and-mortar retail stores and through their Brand Websites.

62.     Defendant Perfect Corp. is one of the world's leading providers of AI and AR services to the beauty and fashion industries, including licensing its VTOs to the Cosmetics Defendants for use on the Brand Websites. Defendant Perfect Corp. is a corporation organized and incorporated in the Cayman Islands and headquartered in New Taipei City, Taiwan, with offices in various locales including in San Jose, California.  Perfect's stock is publicly traded on the New York Stock Exchange.

## FACTUAL ALLEGATIONS

**A.      BIPA'S Legal Framework**

63.     The Illinois General Assembly enacted BIPA to protect the privacy rights of every Illinois resident who has their unique, biometric identifiers captured or retained by self-interested, profit-motivated companies.

64.     In enacting BIPA, the General Assembly found that the sensitivity of biometric information and identifiers warrants heightened protection because companies frequently collect it from individuals like Plaintiffs and Class members. Specifically, the General Assembly found that "[b]iometrics are unlike other unique identifiers" like Social Security Numbers because they are "biologically unique to the individual" and cannot be changed if compromised. 740 Ill. Comp. Stat. 14/5(c).

65.     Thus, a person whose biometrics are compromised "has no recourse" and "is at heightened risk for identify theft." *Id*.

66.     When enacting BIPA, the General Assembly recognized that "[t]he full ramifications of biometric technology are not fully known." 740 Ill. Comp. Stat. 14/5(e). Therefore, "[t]he public welfare, security, and safety will be served by regulating the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information." 740 Ill. Comp. Stat. 14/5(f).

67.     BIPA defines "biometric identifiers" as "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 Ill. Comp. Stat. 14/10.

68.     "Biometric information" is identified as "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." *Id*. Biometric information does not include information derived from items or procedures excluded under the definition of biometric identifiers. *Id*.

69.     Accordingly, BIPA requires "private entities"—including companies like Defendants—that collect certain biometric identifiers or biometric information, or cause such information and identifiers to be collected, to take specific steps to safeguard the biometric data they collect, store, or capture.

70.     Specifically, companies that collect the above-referenced biometric identifiers or biometric information, such as Defendants, must obtain informed consent from consumers prior to collecting such data from them, and they must publicly disclose to consumers their uses, retention of, and a schedule for destruction of the biometric data that they do collect.

71.     With respect to safeguarding biometrics, BIPA requires that private entities—including companies like Defendants—that possess biometric identifiers or biometric information must:

> [D]evelop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first. Absent a valid warrant or subpoena issued by a court of competent jurisdiction, a private entity in possession of biometric identifiers or biometric information must comply with its established retention schedule and destruction guidelines.

*Id*. § 14/15(a).

72.     BIPA also requires that private entities in possession of biometric identifiers or biometric information—including companies like Defendants—must safeguard such data "using the reasonable standard of care within the private entity's industry" and must "store, transmit, and protect from disclosure all biometric identifiers and biometric information in a manner that is the same as or more protective than the manner in which the private entity stores, transmits, and protects other confidential and sensitive information." *Id*. § 14/15(e).

73.     With respect to informed consent, BIPA provides:

> No private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless it first:
>
> > (1) informs the subject or the subject's legally authorized representative in writing that a biometric identifier or biometric information is being collected or stored;
> >
> > (2) informs the subject or the subject's legally authorized representative in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and

(3) receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative.

*Id*. § 14/15(6).

74.     BIPA further provides that "[n]o private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information." *Id*. § 14/15(c).

75.     Under BIPA, private entities—including companies like Defendants—are prohibited from disclosing, redisclosing, or otherwise disseminating a consumer's biometric identifier or biometric information (or causing it to be done) unless the consumer has consented to such disclosure or redisclosure. *Id*. § 14/15(d).

76.     BIPA provides for statutory damages, injunctive relief, reasonable attorney's fees and costs, and other relief "as the State or federal court may deem appropriate" when a private entity violates a consumer's rights under the statute. *Id*. § 14/20. Where a violation is the result of a private entity's negligence, BIPA provides for the greater of actual damages or $1,000 in liquidated damages per violation, and, if the violation was intentional or reckless, BIPA provides for the greater of actual damages and liquidated damages of $5,000 per violation. *Id*.

**B.     Defendants Collected Users' Biometric Data Through the VTOs on the Brand Websites**

77.     Cosmetics Defendants operate the Brand Websites, through which they market and sell products (including makeup and skincare).

78.     Cosmetics Defendants market and promote their makeup brands through the Brand Websites, by allowing users and potential customers on each Brand Website to use various VTOs which permit users to "try on" makeup by augmented reality livestream, by using a live camera feed, taking a "selfie," or by uploading a picture, which Defendants then use to take a scan of the

user's face geometry, and use that scan to "apply" the chosen makeup product on the appropriate areas of the users' face so the user can see how the product would look on their face.

79.     Through the VTOs on the Brand Websites, Defendants capture, collect, use, possess, and otherwise obtain biometric data from online visitors to the Brand Websites. Anyone who visits the Brand Websites can use each website's VTOs to try on various products. The VTOs are available for a variety of products including lipstick, lip liner, foundation, concealer, eye shadow, eye liner, and blush, depending on the particular VTO and the Brand Website.

80.     Upon information and belief, Perfect licenses the technology for the VTOs to the Cosmetics Defendants and runs the VTOs on the Brand Websites on behalf of Cosmetics Defendants and with Cosmetic Defendants' consent.

81.     Upon information and belief, in licensing the VTOs from Perfect, Cosmetics Defendants and Perfect agreed to comply with all applicable data protection, privacy and security laws, including BIPA.

82.     Upon information and belief, in licensing the VTOs from Perfect, Cosmetics Defendants agreed that the capture, collection, use, possession, and storage of end users' personal data, including biometric data, whether directly or indirectly, was Cosmetics Defendants' and Perfect's joint responsibility.

83.     The VTO technology enables Defendants to capture, collect, use, possess and/or otherwise obtain users' biometric data such as face geometry scans.

84.     Defendants capture, collect, use, possess and/or otherwise obtain VTO users' biometric data, including face geometry scans, every time a visitor to the Brand Websites uses the VTO.

85.     The biometric data, including the face geometry scans, captured, collected, used,

and/or otherwise obtained by Defendants each time a visitor to the Brand Websites uses the VTO, is unique to that VTO user and can be used to identify the VTO user.

86. The VTOs on the Brand Websites are run and controlled entirely by Defendants.

87. During the VTO process, only Defendants have access to and control of the code to run the VTO session.

88. VTO users, including Plaintiffs and Class members cannot access, control, modify, delete or request Defendants to delete the data collected by the VTO, including users' biometric data.

89. On esteelauder.com, the lipsticks and "Complete Look" VTOs are accessible using either a computer camera or a mobile device camera, while the "iMatch Virtual Shade Expert" (foundation tool), "iMatch Virtual Skin Analysis", and "Virtual Tutorial" features are only accessible using a mobile device camera.

90. On toofaced.com, users can access the VTO using either a computer camera or mobile device camera to try on multiple products including lipstick, lip gloss, lip balm, blush, bronzer, foundation, concealer, mascara, and lip liner.

91. On smashbox.com, users can access the VTO using either a computer camera or mobile device camera to try on multiple products including lipstick, eye shadow, cheek and lip tint, foundation, concealer, tinted moisturizer, lipstick, lip gloss, eye liner, and eyebrow pencil.

92. On bobbibrowncosmetics.com, while the eye shadow, eye liner, lip liner, blush, and lip gloss features are accessible using either a computer camera or a mobile device camera, the foundation shade match and "Virtual Look Finder" features are only accessible using a mobile device camera.

93.      The process of using the VTOs on the Brand Websites is detailed below and is virtually the same for all the various VTO tools available on each Brand Website.

94.      To use the VTO on the Brand Websites, visitors click the "TRY IT ON", "TRY A LOOK", "FIND YOUR SHADE", or "GET STARTED" button located on the product's picture or next to the color options, as shown in the images from the four Brand Websites below:



*Esteelauder.com Virtual Try-On Product Page*



*Esteelauder.com "Complete Look" VTO Launch Page*, June 19, 2023



*Esteelauder.com "iMatch Virtual Shade Expert" VTO Product Page*, June 24, 2023



*Esteelauder.com "iMatch Virtual Skin Analysis" Launch Page*, June 19, 2023



*Toofaced.com Virtual Try-On Product Page*



*Smashbox.com Virtual Try-On Product Page*



*Bobbibrowncosmetics.com Virtual Try-On Product Page*

95.    Visitors of the VTOs are also presented with an "add to bag" button on the same screen. After clicking "TRY IT ON", "TRY A LOOK", "FIND YOUR SHADE", or "GET STARTED" visitors are prompted to use the "Live Camera" feature which, using the camera on

their computer or mobile device, creates a live video feed. Alternatively, visitors may opt to "Upload [a] photo."

96.     Once a visitor selects an option, the VTO scans the user's face geometry from the live video feed or uploaded image of the user's face, to then superimpose the selected product on the feed or photo, creating an image (whether live or static) which shows what the user would look like with the chosen product on their face, or for the iMatch Virtual Skin Analysis, provides the requested analysis visually on the user's face.

97.     When a visitor to the Brand Websites—including Plaintiffs and Class members, allows Defendants to access their camera livestream or photo with the VTO, Defendants collect, capture, possess, and/or otherwise obtain their facial biometric data and use their facial biometric data to show the visitor how the product will look on his or her face.



98.     Defendants collect, capture, possess, and/or otherwise obtain Brand Websites visitors' biometric data directly from the live or uploaded image on the user's device using an advanced facial detection and recognition algorithm run by Defendants' VTOs on the Brand

Websites. When a visitor to the Brand Websites uses the VTO while they (and the device they are using) are physically in Illinois, Defendants collect, capture, possess, and/or otherwise obtain the visitor's biometric data in Illinois.

99.     During the relevant times of the Complaint, visitors to the Brand Websites were presented with a pop-up screen or message the first time that they accessed the VTO informing the user that their "image" would be used to provide them with the virtual try-on experience. Visitors were not informed that their biometric data would be captured and used to provide them with the virtual try-on experience. Visitors were not asked to consent to the capture or use of their biometric data by Defendants' VTO.

100.     The pop-up message on each VTO included a hyperlink to the Brand Website's privacy policy but did not ask users of the VTO to agree to, consent to, or in any way state that users of the VTO were bound by, the terms of the Privacy Policy or any other potential terms and conditions of the Brand Websites.

101.     Accordingly, at all times relevant hereto, VTO users did not consent to having their biometric data collected, captured, possessed, and/or otherwise obtained by Defendants through the VTOs on the Brand Websites regardless of whether they saw or read the VTO pop-ups/messages or Privacy Policy on the Brand Websites they visited.

102.     During all times relevant hereto, the link to the esteelauder.com Privacy Policy shown to visitors in the pop-up when they launched the VTOs took the user to a version of the Privacy Policy from May 20, 2021 or earlier that did not contain any reference to biometric data, the VTO, or the "virtual try-on experience."

103.     During all times prior to December 30, 2022, the link to the Privacy Policy contained in the footer of the esteelauder.com website took the user to a version of the Privacy

27

Policy that did not contain any reference to biometric data, the VTO, or the "virtual try-on experience." The footer of the esteelauder.com website and link to the Privacy Policy contained in the footer was not visible to website users unless the user affirmatively scrolled down several pages to the very bottom of the page. Website users did not need to scroll down to the very bottom of the page to access or use the VTOs.

104.    During all times prior to December 30, 2022, the link to the toofaced.com Privacy Policy in the VTO pop-up took the user to a version of the Privacy Policy that did not contain any reference to biometric data, the VTO, or the "virtual try-on experience."

105.    During all times prior to December 30, 2022, the link to the smashbox.com Privacy Policy in the VTO pop-up took the user to a version of the Privacy Policy that did not contain any reference to biometric data, the VTO, or the "virtual try-on experience."

106.    During all times prior to November 15, 2021, the link to the bobbibrowncosmetics.com Privacy Policy in the VTO pop-up took the user to a version of the Privacy Policy that did not contain any reference to biometric data, the VTO or the "virtual try-on experience."

107.    Very recently and well after the filing of the Complaint, the Brand Websites updated each of their Privacy Policies to include the following language, admitting the Defendants may capture biometric information, "We may collect or process the following types of information about you. The specific information we collect about you will vary depending on how you interact with us." One of the types of information that the updated Privacy Policy now lists is "Biometric Information, such as facial geometry if you use certain of our virtual try-on applications." Further, the updated Privacy Policy now states under the "State-Specific Disclosures" section,

> "This section applies solely to Illinois residents and supplements our Privacy Policy
> above. As indicated in our Privacy Policy, we may collect biometric information

such as facial geometry if you use certain of our virtual try-on applications. For Illinois residents who provide us with biometric information (such as during use of our virtual try-on apps), in accordance with Illinois state law, we will retain biometric information only until the occurrence of the first of the following: The initial purpose for collecting or obtaining such biometric information has been satisfied, or [t]hree years following your last interaction with us."

108.    At all relevant times, Defendants failed to craft, publish or comply with a written policy establishing a retention schedule and guidelines for permanently destroying biometric identifiers or biometric information obtained from Brand Websites VTO users, including Plaintiffs and Class members.

109.    At all relevant times, Defendants also failed to make any such policy, retention schedule, or guidelines publicly available, in contravention of the statute.

110.    At all relevant times, Defendants had not created such a policy retention schedule, or guidelines, and therefore Defendants did not follow, adhere to, or otherwise comply with or abide by any such policy establishing a retention schedule and guidelines for destroying biometric data obtained from users of the Brand Websites VTOs.

111.    At all relevant times, Defendants did not require or obtain Brand Websites visitors' written consent to collect, capture, possess, and/or otherwise obtain their biometric data when they used the VTOs on the Brand Websites.

112.    Brand Websites visitors who used the VTOs were not informed whether or that their use of the VTOs is subject to any terms and conditions and were not asked to read or consent to any terms and conditions prior to using the VTOs on the Brand Websites. The VTO pop-up did not link to the Terms & Conditions. Assenting to any terms and conditions was not a necessary condition to use the VTOs on the Brand Websites. Plaintiffs and Class Members did not assent to the Terms & Conditions.

113.    Furthermore, the Terms & Conditions, or Terms of Use hyperlinks on the Brand Websites are only visible if a user scrolls down to the bottom of the webpage on each Brand Website, where it appears in small letters. The placement of the Terms & Conditions, or Terms of Use hyperlink is similarly located at the bottom of the screen on each of the four Brand Websites, as shown in the images below:



*esteelauder.com footer*



*toofaced.com footer*



*smashbox.com footer*



*bobbibrowncosmetics.com footer*

## **CLASS ACTION ALLEGATIONS**

114.    Plaintiffs bring this action as a class action pursuant to Rules 23(a), 23(b)(2), and

(b)(3) of the Federal Rules of Civil Procedure, on behalf of a class defined as:

> All persons whose biometric identifiers or biometric information were captured by
> Defendants through use of the VTOs on esteelauder.com, toofaced.com,
> smashbox.com, and bobbibrowncosmetics.com; while residing in Illinois, from five
> years preceding the date of the filing of this action to the present.

115.    Excluded from the Class are Defendants and any of their members, affiliates,

parents, subsidiaries, officers, directors, employees, successors, or assigns; and the Court staff

assigned to this case and their immediate family members. Plaintiffs reserve the right to modify or

amend the Class definition, as appropriate, during this litigation.

116.    This action is brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

117.    **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** The proposed Class is sufficiently numerous that individual joinder of all Class members is impracticable. While Plaintiffs believe that there are not less than one hundred thousand (100,000) Class members, the precise number of Class members is presently unknown to Plaintiffs, but may be ascertained from Defendants' books, records, and electronically stored information. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

118.    **Commonality and Predominance—Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting only individual Class members, including, without limitation:

    a.    Whether Defendants qualify as a "private entity" as defined by 740 Ill. Comp. Stat. 14/10;

    b.    Whether Defendants capture, collect, use, store, and/or otherwise obtain information that qualifies as "biometric information" or "biometric identifiers" of users of the VTOs on the Brand Websites, as defined by 740 Ill. Comp. Stat. 14/10 and 740 Ill. Comp. Stat. 14/15, *et seq*.;

    c.    Whether Defendants developed, made publicly available, and/or complied with, a written policy establishing a retention schedule and guidelines for destroying their VTO users' biometric information and biometric identifiers on each of the Brand Websites, as 740 Ill. Comp. Stat. 14/15(a) requires;

    d.    Whether Defendants obtained an executed written release from each user of the VTOs on each of the Brand Websites before capturing their biometric information and biometric identifiers, as 740 Ill. Comp. Stat. 14/15(b) requires;

    e.    Whether Defendants, previously or on an ongoing basis, collected, captured, purchased, received through trade, or otherwise obtained the Brand Websites users' biometric identifiers or biometric information through the VTOs on the Brand Websites, in violation of 740 Ill. Comp.

Stat. 14, *et seq.*;

f.   Whether Defendants sold, leased, traded, or otherwise profited from VTO users' biometric identifiers or biometric information;

g.   Whether Defendants' conduct was and is willful, reckless, or negligent;

h.   The appropriate measure of damages to award Plaintiffs and Class members; and

i.   The appropriate injunctive relief to which Plaintiffs and Class members are entitled.

119.   **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of Class members' claims because Plaintiffs and each Class member used the same VTOs on the Brand Websites, through which Defendants collected, captured, purchased, received through trade, or otherwise obtained their biometric identifiers or biometric information, and did not inform Plaintiffs or Class members of such collection, capture, purchase, receiving through trade, or otherwise obtaining of such biometric identifiers or biometric information, and did not obtain written consent for this same capture, collection, purchase, receiving through trade, or otherwise obtaining of biometric information or biometric identifiers from Plaintiffs or Class members.

120.   **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of Class members who they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where a defendant breached statutory obligations, and Plaintiffs intend to vigorously prosecute this action. Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

121.     **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).** Defendants acted or refused to act on grounds generally applicable to Plaintiffs and Class members, thereby making appropriate final injunctive relief and/or declaratory relief, as described below.

122.     **Superiority—Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
Violation of 740 Ill. Comp. Stat. 14/15(b)
(Failure to Inform in Writing and Obtain Written Release from Users Prior to
Capturing, Collecting, or Storing Biometric Identifiers or Biometric Information)
(Against All Defendants)

123.     Plaintiffs reassert, reallege, and incorporate by reference each of the allegations contained in Paragraphs 1 through 122 above, as though asserted and alleged herein.

124.     Plaintiffs bring this claim individually and on behalf of the Class members against all Defendants.

125.     Defendants' VTO technology captured—and continues to capture—Plaintiffs' and Class members' facial geometry scans.

126.     Facial geometry is a biometric identifier protected by BIPA.

127.     BIPA prohibits private entities like Defendants from collecting, capturing, purchasing, receiving through trade, or otherwise obtaining Brand Websites VTO users' biometric identifiers or biometric information without first informing them in writing of such activities; informing them in writing of the specific purpose and duration for which biometric identifiers or biometric information are being collected, stored, and used; and obtaining a written release executed by the VTO users whose biometric identifiers or biometric information is being captured, collected, or otherwise obtained.

128.     Defendants do not inform the Brand Websites' users in writing that their biometric information will be captured or collected through the use of the VTOs; do not inform them in writing of the specific purpose and duration that their biometric information will be collected, stored, and used; and do not obtain written consent from their customers, affirming that by using Defendants' VTOs, their biometric information and biometric identifiers will be captured, collected, or otherwise obtained.

129.     Defendants are continuing to collect, capture, use, possess, and/or otherwise obtain biometric information and biometric identifiers of the Brand Websites' VTO users, without the specific permission required by BIPA.

130.     Plaintiffs and Class members have been injured by Defendants' conduct alleged herein, which injury includes the unknowing loss of control of their most unique biometric identifiers, and violations of their privacy due to Defendants' collection, capture, and/or possession of their biometric information and biometric identifiers, accordingly, the imposition of statutory damages under BIPA is appropriate here.

**SECOND CAUSE OF ACTION**
**Violation of 740 Ill. Comp. Stat. 14/15(a)**
**(Failure to Develop and Make Publicly Available a Written Policy for Retention and
Destruction of Biometric Identifiers or Biometric Information)**
**Damages and Injunctive Relief**
**(Against All Defendants)**

131.    Plaintiffs reassert, reallege, and incorporate by reference each of the allegations
contained in Paragraphs 1 through 122 above, as though asserted and alleged herein.

132.    Plaintiffs bring this claim individually and on behalf of Class members against all
Defendants.

133.    Defendants' VTOs operate by capturing the facial geometry of users of Defendants'
VTOs, including Plaintiffs and Class members.

134.    Facial geometry is a biometric identifier protected by BIPA.

135.    BIPA requires private entities, like Defendants, in possession of biometric
identifiers or biometric information to develop and comply with a written policy, made available
to the public, establishing a retention schedule and guidelines for permanently destroying
biometric identifiers and biometric information when the initial purpose for collecting or obtaining
such identifiers or information has been satisfied or within three years of the individual's last
interaction with the private entity, whichever occurs first.

136.    Defendants did not develop, possess, or publish to the Brand Websites users—
including Plaintiffs and Class members—such a written policy at any time prior to or during
Defendants' capture, collection and/ or obtaining, of Plaintiffs' and Class members' biometric
information or biometric identifiers, which Defendants caused to be obtained through the VTOs
on the Brand Websites.

137.    Defendants did not follow, adhere to, comply with, or otherwise abide by a
publicly-available written policy at any time during their capture or collection of Plaintiffs' and

Class members' biometric information or biometric identifiers, which Defendants caused to be obtained through the VTOs on the Brand Websites.

138. As a result, Defendants denied Plaintiffs and Class members of their rights under BIPA to be made aware of Defendants' retention and destruction policies as to their biometric identifiers, and of their rights to have Defendants comply with BIPA's retention and destruction requirements. Additionally, Defendants' failure to develop the required retention and destruction policies placed Plaintiffs' and Class members' sensitive biometric identifiers at risk of compromise or illicit use by Defendants and others.

139. Plaintiffs and Class members have been injured by Defendants' conduct, as alleged herein, which injury includes the unknowing loss of control of their most unique biometric identifiers, and violations of their privacy due to Defendants' collection, capture, and storage of their biometric information and biometric identifiers, and their sharing of that data with foreign companies; accordingly, the imposition of statutory damages under BIPA is appropriate here.

140. Moreover, an injunction is warranted pursuant to 740 Ill. Comp. Stat. 14/20(4), requiring Defendants to develop a written policy, inform Plaintiffs and Class members of that policy, after ensuring that their information is destroyed, and abide by that policy in the future.

### THIRD CAUSE OF ACTION
### VIOLATION OF 740 ILCS 14/15(c)
**Prohibition Against Selling, Leasing, Trading, or Otherwise Profiting from a Person's Biometric Identifiers or Biometric Information**
**Damages and Injunctive Relief**
**(Against Cosmetics Defendants)**

141. Plaintiffs reassert, reallege, and incorporate by reference each of the allegations contained in Paragraphs 1 through 122 above, as though asserted and alleged herein.

142. Plaintiffs bring this claim individually and on behalf of Class members against Cosmetics Defendants.

143. Cosmetics Defendants, through the VTOs on the Brand Websites, collected, captured, possessed and/or otherwise obtained Plaintiffs' and Class members' biometric identifiers, including facial geometry.

144. Facial geometry is a biometric identifier protected by BIPA.

145. Cosmetics Defendants were, and, on information and belief, currently still are, in possession of the biometric identifiers and biometric information collected, captured, used, possessed and/or otherwise obtained by Cosmetics Defendants through use of the VTOs on the Brand Websites.

146. BIPA prohibits private entities, like Cosmetics Defendants, in possession of biometric identifiers or biometric information, from selling, leasing, trading, or otherwise profiting from those biometric identifiers or biometric information.

147. Cosmetics Defendants provide the VTOs on their Brand Websites to increase online sales of their makeup products.

148. Cosmetics Defendants provide the VTOs on their Brand Websites as a way for potential customers to try on makeup from Cosmetics Defendants' beauty brands before purchasing it.

149. Cosmetics Defendants' potential customers are more likely to buy makeup from Cosmetics Defendants' beauty brands, if they can see how the products would look on them first.

150. It is the facial geometry scans collected, captured, used, possessed and/or otherwise obtained by Cosmetics Defendants through use of Defendants' VTOs on the Brand Websites that allow for the proper placement of the makeup products on website users' faces, which enables users to see how makeup products from Cosmetics Defendants' beauty brands look on them when worn.

151. Upon information and belief, Cosmetics Defendants' makeup sales have increased since Cosmetics Defendants began offering the VTOs on the Brand Websites. For example, Perfect's website states that Estee Lauder has experienced 2.5 times conversion rate with the Lip VTO, and "boosts in sales" since implementing the VTOs.[8]

152. As a result, Cosmetics Defendants violated BIPA by unlawfully selling, leasing, trading, or otherwise profiting from individuals' biometric identifiers and biometric information, including the biometric identifiers and information of Plaintiffs and Class members.

153. Plaintiffs and Class members have been injured by Cosmetics Defendants' conduct alleged herein, which injury includes the unknowing loss of control of their most unique biometric identifiers, violations of their privacy due to Defendants' collection, capture, usage, and/or possession of their biometric identifiers and biometric information, and violation of their rights in and ownership of their unique biometric identifiers and biometric information through Defendants' profiting from the same; accordingly the imposition of statutory damages under BIPA is appropriate here.

154. Moreover, an injunction is warranted pursuant to 740 Ill. Comp. Stat. § 14/20(4), requiring Cosmetics Defendants to stop selling, leasing, trading, or otherwise profiting from Plaintiffs' and Class members' biometric identifiers or biometric information.

## **REQUEST FOR RELIEF**

Wherefore, Plaintiffs, individually and on behalf of Class members, respectfully request that the Court enter an order granting the following relief:

---

[8] *See* https://www.perfectcorp.com/business/successstory/detail/1, last visited June 19, 2023.

a.    Finding that this action satisfies the requirements for maintenance as a class action as set forth in Rule 23 of the Federal Rules of Civil Procedure and certifying the class defined herein;

b.    Appointing Plaintiffs as representative of the Class and their undersigned counsel as class counsel;

c.    Entering judgment in favor of Plaintiffs and Class members and against Defendants;

d.    Awarding Plaintiffs and Class members liquidated damages of $1,000 per negligent violation, $5,000 per willful or reckless violation, or actual damages, whichever is greater, for each of Defendants' BIPA violations;

e.    Issuing an injunction ordering Defendants to comply with BIPA and to obtain written consent from Brand Websites users prior to capturing, collecting, using, possessing and/or otherwise obtaining their biometric information or biometric identifiers;

f.    Issuing an injunction ordering Defendants to comply with BIPA and to properly disclose to Plaintiffs and Class members whether Defendants possess their biometric identifiers or biometric information, Defendants' uses of their biometric information or biometric identifiers; and Defendants' retention and destruction policies regarding their biometric information or biometric identifiers;

g.    Issuing an injunction ordering Defendants to comply with BIPA by preparing, producing, or adopting a published retention and destruction policy for the biometric information or biometric identifiers that they collects;

h.      Issuing an injunction ordering Defendants to comply with BIPA going forward by ceasing selling, leasing, trading, or otherwise profiting from Plaintiffs' and Class members' biometric identifiers or biometric information;

i.      Awarding reasonable attorneys' fees and costs, including expert witness fees and other litigation expenses, as provided for in 740 Ill. Comp. Stat. 14/20; and

j.      Granting such other and further relief as the Court deems appropriate.

## JURY TRIAL REQUESTED

Plaintiffs, individually and on behalf of Class members, request a trial by jury on all claims so triable.


Dated: June 26, 2023            Respectfully submitted,


              */s/ Amy E. Keller*
              ADAM J. LEVITT
              alevitt@dicellolevitt.com
              AMY E. KELLER
              akeller@dicellolevitt.com
              NADA DJORDJEVIC
              ndjordjevic@dicellolevitt.com
              JAMES A. ULWICK
              julwick@dicellolevitt.com
              SHARON CRUZ
              scruz@dicellolevitt.com
              **DiCELLO LEVITT LLP**
              Ten North Dearborn Street, Sixth Floor
              Chicago, Illinois 60602
              Telephone: (312) 214-7900

              JAMES J. PIZZIRUSSO*
              jpizzirusso@hausfeld.com
              **HAUSFELD LLP**
              888 16th Street, NW, Suite 300
              Washington, D.C. 20006
              Telephone: (202) 540-7200

STEVEN M. NATHAN*
snathan@hausfeld.com
KATHERINE HANSSON*
khansson@hausfeld.com
**HAUSFELD LLP**
33 Whitehall St., 14th Floor
New York, New York 10004
Telephone: (646) 357-1100

Don Bivens**
don@donbivens.com
**DON BIVENS PLLC**
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, Arizona 85254
Telephone: (602) 708-1450

***Counsel for Plaintiffs and the Proposed
Class***

*\* Admitted Pro Hac Vice*

*\*\*Pro Hac Vice Admission
Applications Forthcoming*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing what filed using this Court's CM/ECF service, which will send notification of such filing to all counsel of record who have already filed their appearances this 26th day of June 2023.

*/s/ Amy Keller*_____
Amy Keller
